FILED LODGED
RECEIVED COPY
OCT 01 2026
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY DEPUTY

Danny H. Cooprider
1703 W. Rovey Ave.
Phoenix, AZ 85015
Telephone: (602) 246-6154
Email: dhcooprider@gmail.com
Plaintiff, *In Propria Persona*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Danny H. Cooprider**<br>Plaintiff,<br>v.<br>**John Does 1–10,**<br>**each an individual, corporation, or other entity whose true name is unknown,**<br>Defendants. | Case No.: **CV26-07094-PHX-JJT**<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL<br><br>(1) 47 U.S.C. § 227(b)(1)(A)(iii) — Artificial Voice<br>(2) 47 U.S.C. § 227(b)(1)(A)(iii) — ATDS (Text Messages)<br>(3) 47 C.F.R. § 64.1200(c)(2)<br>(4) 47 C.F.R. § 64.1200(d)(4)<br>(5) A.R.S. § 44-1282(A); A.R.S. § 44-1533(B)<br>(6) A.R.S. §§ 44-1276(A), 44-1278(B)(3), (B)(4)<br>(7) Intrusion Upon Seclusion<br>(Jury Trial Demanded) |

NOW COMES the Plaintiff, DANNY H. COOPRIDER, appearing in propria persona, and for his complaint against Defendants JOHN DOES 1–10 (collectively, "Defendants"), alleges:

## NATURE OF THE ACTION

1. Plaintiff has the right to be let alone. He has the right to decide who may reach him on his own telephone, and he has the right to be the one who decides whether a

commercial transaction begins. Justice Brandeis called that right "the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), *quoted in Stanley v. Georgia*, 394 U.S. 557, 564 (1969). As against private persons, the Supreme Court has explained, "the protection of a person's general right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." *Katz v. United States*, 389 U.S. 347, 350 (1967). Arizona supplies that protection in its Constitution, which provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law," Ariz. Const. art. 2, § 8, and in the privacy torts its Supreme Court recognizes against private parties, *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 338, 342, 783 P.2d 781 (1989).

2. Against a private seller, the right belongs to the person who is approached, not the person who approaches. "[T]he right of every person 'to be let alone' must be placed in the scales with the right of others to communicate"; a seller's right to reach a person "must stop at the mailbox of an unreceptive addressee"; and "no one has a right to press even 'good' ideas on an unwilling recipient." *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 736–38 (1970). Whether a solicitor may call at a home has "been deemed to depend upon the will of the individual master of each household, and not upon the determination of the community." *Martin v. City of Struthers*, 319 U.S. 141, 141 (1943).

3. Congress built the National Do-Not-Call Registry on that principle. The Registry protects "residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," 47 U.S.C. § 227(c)(1), and the statute defines a "telephone solicitation" by the absence of the recipient's "prior express invitation or permission," 47 U.S.C. § 227(a)(4)(A). The Ninth Circuit has held that the Act "establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent," and that "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). The Registry "means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019).

4. Plaintiff exercised that right in the way the law provides. He personally registered his cellular telephone number (602) 246-6154 on the National Do-Not-Call Registry on December 6, 2005, and his cellular telephone number (303) 378-8161 on February 6, 2007, and both registrations have remained in force ever since. He never invited any Defendant to call or text him, never did business with any Defendant, and never gave any Defendant either number.

5. Between May 5, 2025 and June 24, 2026, Defendants reached those lines anyway, eight times: five text messages selling windshield replacement, two telephone calls selling roof inspections and insurance-claim roofing work, and one telephone call placed

by an artificial, computer-generated voice seeking to buy Plaintiff's home. Defendants took for themselves a decision that the law reserves to Plaintiff: whether Defendants would be heard on Plaintiff's telephone at all.

6. Defendants did not take that decision in the open. Each of the three campaigns used a telephone number that the carrier of record has identified with a single customer account, and the campaigns ran under two different trade names and, in the third campaign, no name at all. The computer-generated voice gave two different human names in its first thirty seconds, repeatedly refused to name the company it represented, and, when asked for a callback number, recited Plaintiff's own telephone number as its own. The roofing caller told Plaintiff that his company would not appear in any search because "we're working on the website right now." Every count that follows is a remedy Congress, the Arizona Legislature, or the common law provides for that taking.

7. This action arises under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, and its implementing regulations, 47 C.F.R. § 64.1200; the Arizona Consumer Fraud Act ("CFA"), A.R.S. §§ 44-1522 and 44-1533, through the unlawful practices declared by A.R.S. §§ 44-1282(B), 44-1276, and 44-1278; and the Arizona common law of intrusion upon seclusion. Plaintiff seeks statutory damages, treble damages, actual and punitive damages, injunctive relief, and costs.

## PARTIES

8. Plaintiff Danny H. Cooprider is a natural person and a resident of Maricopa County, Arizona, residing at 1703 W. Rovey Ave., Phoenix, Arizona 85015. Plaintiff is the

subscriber to, customary user of, and actual recipient of the calls and text messages placed to cellular telephone number (303) 378-8161 (the "8161 Line") and cellular telephone number (602) 246-6154 (the "6154 Line," and together with the 8161 Line, the "Lines").

9. Defendant John Doe 1 is the person or entity, whose true name is unknown to Plaintiff, that holds the account with Twilio Inc. ("Twilio") through which telephone numbers (227) 230-0339, (602) 905-4259, and (480) 805-5929 were provisioned and used to place the calls and send the text messages alleged herein.

10. Defendants John Does 2–10 are the persons and entities, whose true names are unknown to Plaintiff, that placed or sent the calls and text messages alleged herein, that caused them to be placed or sent, or on whose behalf they were placed or sent, including the operators doing business as "Straight Layer" and as "the Auto Glass Guys," the principal of the company that the artificial voice on Call A-1 described as one "that specializes in purchasing properties for cash," and any calling or messaging vendor, platform, or reseller that itself initiated the calls or sent the text messages alleged herein, or did so as the agent of a seller.

11. Defendants' identities are known to Defendants and to their telecommunications provider and cannot be learned by Plaintiff without discovery. Plaintiff designates them by fictitious names, will move for leave to conduct limited early discovery from Twilio and any entity it identifies for the purpose of learning their names, and will seek leave to amend this Complaint when their true names are discovered. *Gillespie v. Civiletti*, 629

F.2d 637, 642 (9th Cir. 1980). Each Defendant's liability is alleged campaign by campaign in paragraph 25. No Defendant is alleged to be liable for the contacts of a campaign in which it did not participate as alleged there.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because Plaintiff's claims under the TCPA, 47 U.S.C. § 227, arise under the laws of the United States, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012), and under 28 U.S.C. § 1367, because Plaintiff's claims under the Arizona Consumer Fraud Act and the Arizona common law arise from the same case or controversy as the federal claims.

13. This Court has personal jurisdiction over each Defendant because each committed or caused the unlawful acts alleged herein by directing telephone calls and text messages into Arizona to an Arizona resident, for the purpose of selling roofing, auto-glass, and real-estate services to be performed on or concerning Arizona property. The roofing caller described his company as "a local roofing company in Phoenix" that would be "out there tomorrow" on Plaintiff's street.

14. Venue is proper under 28 U.S.C. § 1391(b)(2), because the telephone calls and text messages complained of herein were received by Plaintiff in this judicial district, at Plaintiff's residence in Maricopa County, Arizona.

## FACTUAL ALLEGATIONS

**A. Plaintiff's Telephone Lines and Do-Not-Call Registrations**

15. Plaintiff Danny H. Cooprider personally registered the 6154 Line on the National Do-Not-Call Registry maintained by the Federal Trade Commission on December 6, 2005, and personally registered the 8161 Line on the Registry on February 6, 2007. Each Line has been so listed continuously at all times since: more than nineteen years for the 6154 Line, and more than eighteen years for the 8161 Line, as of the first contact alleged herein. True copies of the Registry's verifications of those registrations are attached as Exhibits A and B.

16. Both Lines are cellular telephone lines. Plaintiff uses both primarily for personal, family, and household communications. The 8161 Line is a residential line. The 6154 Line is a residential line that Plaintiff also uses in connection with a personal woodworking hobby, and it is, at most, dual-use. A cellular or dual-use telephone number used for residential purposes is a "residential telephone subscriber" line entitled to the protections of the do-not-call rules. *Chennette v. Porch.com, Inc.*, 50 F.4th 1217 (9th Cir. 2022); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983 (9th Cir. 2023). The Federal Communications Commission has declared that wireless subscribers who ask to be put on the National Do-Not-Call Registry are presumed to be "residential subscribers." *In re Rules & Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14039, ¶ 36 (2003).

17. Plaintiff is the subscriber to and customary user of each Line, is the actual recipient of each call and text message at issue, and suffered the invasion of privacy alleged herein.

18. A text message is a "call" within the meaning of the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009). Arizona's do-not-call statute expressly reaches an outbound telephone solicitation "call or text message." A.R.S. § 44-1282(A).

**B. Absence of Consent and Business Relationship**

19. At no time has Plaintiff provided either Line to any Defendant, or to any person or entity acting on a Defendant's behalf.

20. At no time has Plaintiff requested any goods, services, or information from any Defendant. Plaintiff has never inquired about windshield or auto-glass replacement, roof inspection or roofing work, or the sale of his home to any Defendant or to anyone using any of the names the callers and senders gave.

21. At no time has Plaintiff given any Defendant prior express consent, or prior express invitation or permission, written or oral, to call or text either Line.

22. At no time has Plaintiff had an "established business relationship," as that term is used in the TCPA and its regulations, with any Defendant.

**C. One Account, Three Campaigns**

23. Each of the calling and sending numbers alleged herein is a non-fixed voice-over-internet-protocol ("VoIP") number whose carrier of record is Twilio, a cloud-communications platform that provisions telephone numbers to its customers. Plaintiff conducted carrier and caller-name ("CNAM") lookups on each number through Twilio's Lookup service:

| Campaign | Number | Carrier of Record | Line Type | Name Returned | Lookup Date |
|---|---|---|---|---|---|
| A | (227) 230-0339 | Twilio - SMS/MMS-SVR | non-fixed VoIP | none | 05/29/2026 |
| B | (602) 905-4259 | Twilio - SMS/MMS-SVR | VoIP | none | 02/16/2026 |
| B | (602) 905-0208 | Twilio - SMS/MMS-SVR | non-fixed VoIP | none | 06/28/2026 |
| C | (480) 805-5929 | Twilio - SMS/MMS-SVR | VoIP | "AUTO GLASS" | 02/16/2026 |

24. On September 23, 2026, Plaintiff wrote to Twilio's legal department, by certified mail and by email, identifying the calls and text messages alleged herein by date, time, calling number, and receiving line, and requesting that Twilio preserve the associated records. On September 25, 2026, Twilio's Legal Department responded in writing that it had investigated and taken action against "the relevant customer associated with the phone numbers 227-230-0339, 602-905-4259, and 480-805-5929," and that it had forwarded Plaintiff's preservation request "to the account owner for phone numbers 227-230-0339, 602-905-4259, and 480-805-5929." Twilio stated that it would not disclose "customer or account details without a legally binding process," and that it was "prepared to comply promptly upon receipt of a valid subpoena or other legal process following the filing of your complaint against a John Doe or unknown entity defendant." Twilio further stated that the customer associated with those three numbers had been "blocked from contacting the phone numbers ending in 8161 and 6154," and that the communications

from the remaining numbers Plaintiff had identified to it, which included (602) 905-0208, the number displayed on Call B-2, "appear to have been spoofed," which Twilio explained to mean placed through "a non-Twilio service" while made to appear on the recipient's caller identification as coming from a Twilio number, so that Twilio "maintains no records of them."

25. The three numbers Twilio identified with a single account owner carried three separate campaigns under three separate trade names, each alleged below: an artificial-voice home-buying campaign (Campaign A), a roofing campaign under the name "Straight Layer" (Campaign B), and an auto-glass campaign under the name "the Auto Glass Guys" (Campaign C). Plaintiff does not yet know whether John Doe 1 placed those calls and sent those messages itself or furnished the account, numbers, and calling and messaging platform through which others did so. Plaintiff therefore alleges each Defendant's liability campaign by campaign, on information and belief, as follows. (a) Campaign A: the person or entity that initiated Call A-1 is liable directly as its initiator, and the company that the artificial voice described as one "that specializes in purchasing properties for cash" is liable as the seller on whose behalf Call A-1 was made, because the caller acted with that company's actual authority, with its apparent authority, or with its subsequent ratification of the call. (b) Campaign B: the person or entity that initiated Calls B-1 and B-2 is liable directly as their initiator, and the entity doing business as "Straight Layer" is liable as the seller on whose behalf both calls were made, on the same agency grounds. (c) Campaign C: the person or entity that sent Texts C-1 through C-5 is

liable directly as their sender, and the entity doing business as "the auto glass guys" is liable as the seller on whose behalf they were sent, on the same agency grounds. (d) John Doe 1 is liable for the contacts of each campaign that it initiated or sent itself, and for the contacts of each campaign that it initiated or sent as the agent of that campaign's seller. Each Defendant is liable, jointly and severally with every other Defendant liable for the same contacts, for the contacts of each campaign in which it participated as alleged in this paragraph, and not for the contacts of any other campaign.

26. Each campaign was keyed to Plaintiff's home or property. On information and belief, before the first contact in each campaign, Defendants had acquired consumer data concerning Plaintiff, including his telephone numbers and, for Campaigns A and B, his name and the street address of his home, keyed together. The artificial voice on Call A-1 recited Plaintiff's street address, city, and nine-digit ZIP code to him. The caller on Call B-1 asked for Plaintiff by name, recited his street address, and said that his company "got your number from Public City Records."

**D. Campaign A — The Artificial-Voice Home-Buying Call**

**Call A-1 — May 29, 2026**

27. On May 29, 2026, at approximately 10:30 a.m. Mountain Standard Time, Defendants initiated a telephone call to the 8161 Line from (227) 230-0339. No caller name was displayed. The call lasted approximately five minutes and forty-eight seconds and was recorded.

28. The voice on the call was an artificial, computer-generated voice: a conversational software agent that generated spoken responses in real time rather than a human being. It opened: "This is Jordan calling about your property. I wanted to check if you're still interested in receiving a cash offer and to confirm a few details." It then asked Plaintiff's "current asking price" and "ideal timeline" for selling. Plaintiff had never offered his home for sale and had never requested an offer.

29. When Plaintiff asked who was calling, the voice answered: "My name is Vicky," and stated that it was calling to see whether Plaintiff was "still interested in receiving a cash offer" for his property, reciting Plaintiff's street address, city, and nine-digit ZIP code.

30. Plaintiff told the voice that it sounded "like a computerized voice" and asked, twice, "Are you a real person?" The voice did not answer the question. It responded: "I understand your concerns. I'm here to assist you with information about potentially selling your property." When Plaintiff said, "You're an automated call," the voice again did not deny it and returned to its script.

31. Plaintiff asked the voice six times, in substance, for the name of the company it represented. Each time it declined. It said: "I represent a company that specializes in purchasing properties for cash," and "I can't share specific company details here, but I'd be happy to arrange a time for you to speak with a representative who can provide all the answers you're looking for." Its stated object was to schedule Plaintiff for a further call with a "representative" of that company.

32. Plaintiff asked for a telephone number at which he could call the company back. The voice answered: "You can reach us back at +1 (303) 378-8161," which is Plaintiff's own number, the 8161 Line. When Plaintiff pointed out that the number was his own, the voice repeated it. When Plaintiff asked again, the voice said: "I cannot provide specific company details, including phone numbers."

33. On information and belief, Call A-1 was initiated for the purpose of encouraging Plaintiff to purchase, rent, or invest in services, including the services of the unnamed company's "representative" in the disposition of Plaintiff's home and the assignment of any resulting contract to a downstream buyer or investor, and it was therefore a telephone solicitation. Regardless of its purpose, Call A-1 used an artificial voice, and the Federal Communications Commission has declared that calls made with artificial-intelligence technologies that generate human voices use an "artificial . . . voice" within the meaning of 47 U.S.C. § 227(b). *In re Implications of Artificial Intelligence Technologies on Protecting Consumers from Unwanted Robocalls and Robotexts*, CG Docket No. 23-362, Declaratory Ruling, FCC 24-17 (rel. Feb. 8, 2024).

**E. Campaign B — The "Straight Layer" Roofing Calls**

**Call B-1 — January 22, 2026**

34. On January 22, 2026, at approximately 2:40 p.m. Mountain Standard Time, Defendants initiated a telephone call to the 8161 Line from (602) 905-4259. No caller name was displayed. The call lasted approximately four minutes and twenty-five seconds and was recorded.

35. A live caller asked for Plaintiff by his surname and said: "This is Alex with Straight Layer," adding that the company would be "out there tomorrow" on Plaintiff's street "checking the rooftops for all of the weather damage." Asked to repeat the company's name, he said: "This is Alex Anderson with Straight Layer. We're a local roofing company in Phoenix." He offered appointment windows over the following two days, asked whether Plaintiff was "still the owner" at Plaintiff's street address, which he recited, and described the offer: "If there is any damage, we'll show you how we can help through the insurance." He asked the age of Plaintiff's roof and the name of Plaintiff's insurance carrier.

36. Plaintiff asked how the caller had obtained his telephone number. The caller answered: "once we confirmed damage in the area, we got your number from Public City Records."

37. Plaintiff asked whether the company was a registered contractor. The caller answered: "Yeah, we're licensed, bonded, insured, everything," but gave no license number. Plaintiff told the caller that he could find no company named Straight Layer. The caller answered: "We're not going to pop up because we're working on the website right now."

**Call B-2 — January 23, 2026**

38. On January 23, 2026, at approximately 1:12 p.m. Mountain Standard Time, the next day, Defendants initiated a telephone call to the 6154 Line that displayed as its caller identification (602) 905-0208, a number in the same (602) 905 exchange block as the

number used for Call B-1. No caller name was displayed. The call lasted approximately one minute and twenty seconds and was recorded.

39. A live caller identified a roofing company that would be on Plaintiff's street the next day checking roofs, and asked whether Plaintiff was the homeowner of a single-family house. Asked which roofing company was calling, the caller confirmed that it was "Straight Layer." Plaintiff told the caller that there was no business registered by that name.

40. Calls B-1 and B-2 were one campaign. They were placed on consecutive days, displaying numbers in the same exchange block, under the same trade name, with the same opening: a roofing company checking roofs on Plaintiff's street the next day. On information and belief, both were placed by or on behalf of the same entity. Each was initiated for the purpose of encouraging the purchase of roofing inspection, roofing repair, and insurance-claim roofing services, and each was therefore a "telephone solicitation" within the meaning of 47 U.S.C. § 227(a)(4) and 47 C.F.R. § 64.1200(f).

41. Neither caller stated the telephone number or the address of the person or entity on whose behalf the call was made, neither stated the legal name of any seller, and neither stated the address from which the call was made.

**F. Campaign C — The "Auto Glass Guys" Text Messages**

42. Between May 5, 2025 and June 24, 2026, Defendants sent five text messages from (480) 805-5929, four to the 6154 Line and one to the 8161 Line. Each promoted windshield and auto-glass repair and replacement, and each was signed by "Jared" of "the

auto glass guys." Plaintiff had never done business with, contacted, or given either Line to any person using that name. The messages read, in full:

| Text | Date and Time (MST) | Line | Message |
|---|---|---|---|
| C-1 | 05/05/2025, 9:37 a.m. | 6154 | "It's Jared with the auto glass guys. Just checking in. Do you have any glass damage we can help you with? *If you'd rather we not check-in, reply stop" |
| C-2 | 08/22/2025, 3:01 p.m. | 6154 | "Happy Friday! It's Jared with the auto glass guys; doing our last summer check in. Any damage on the glass we can help with?" |
| C-3 | 12/10/2025, 12:32 p.m. | 6154 | "Hope you had a great holiday! Just checking in to see how the windshields are doing. Do you have any glass damage we can help with? Jared & The Autoglass Guys" |
| C-4 | 04/01/2026, 3:33 p.m. | 6154 | "It's Jared & the Auto glass guys. Just checking in to see how the windshields are doing. Do you have any glass damage we can help with?" |
| C-5 | 06/24/2026, 3:04 p.m. | 8161 | "It's Jared & the Auto glass guys. Just checking in on your windshields. Do you have any damage we can help with? *If you rather we not check in, reply Stop" |

43. Each text message was sent for the purpose of encouraging the purchase of goods and services, namely auto-glass repair and windshield replacement, and each was therefore a "telephone solicitation" within the meaning of 47 U.S.C. § 227(a)(4) and 47 C.F.R. § 64.1200(f), and an outbound telephone solicitation text message within the meaning of A.R.S. § 44-1282(A). The messages framed each solicitation as a "check-in," as though the sender already served Plaintiff. It did not. No message gave a business name other than "the auto glass guys," a street address, or a telephone number other than the sending number.

44. The five messages were one campaign sent by or on behalf of the same entity. They came from one number, under one name and one sender persona, from one template: a greeting, "Just checking in," and a question whether Plaintiff had glass damage "we can help with." They arrived at intervals of roughly three to four months over nearly fourteen months, on two different Lines. Two of them carried the same automated opt-out instruction, "reply stop," a keyword convention of commercial bulk-messaging platforms. None was addressed to Plaintiff by name.

**G. Willfulness**

45. Defendants' violations were willful and knowing. The National Do-Not-Call Registry is available to every seller and telemarketer for the purpose of complying with the law, and the federal rule implementing it requires telemarketers to scrub their calling lists against it no less often than every thirty-one days. 16 C.F.R. § 310.4(b)(3)(iv). Defendants held Plaintiff's telephone numbers, and in two campaigns his home address, before they first contacted him. The roofing caller described the source of Plaintiff's number as "Public City Records." The Registry, on which the Lines had then been entered for more than eighteen and nineteen years, is itself a public government database open to every telemarketer. Defendants consulted the records that served them and did not consult the Registry, or consulted it and called anyway.

46. Defendants arranged each campaign so that the person contacted could not identify, and therefore could not direct a do-not-call request to, the seller. No calling or sending number carried the legal name of any seller. The artificial voice on Call A-1 refused,

when asked repeatedly, to name its company or to give any address or telephone number for it, and supplied Plaintiff's own number as the company's callback number. The roofing caller named a company that he said could not be found and gave no telephone number, address, or license number for it. The text messages gave only a first name and "the auto glass guys." An operation that intends to honor a do-not-call request tells the consumer whom to ask. None of these did.

47. The artificial voice on Call A-1 was asked directly, twice, whether it was a real person, and was told by Plaintiff that it sounded like "a computerized voice." It did not disclose that it was an automated system, and it continued the solicitation. On information and belief, the system was configured to continue selling rather than to answer that question, and thereby to conceal the one fact that 47 U.S.C. § 227(b) makes decisive.

48. Defendants operate a professional telemarketing operation. A single customer account with the carrier of record carried three campaigns for three different lines of business under at least two trade names, using a conversational artificial-voice agent, live calling personnel, and a recurring text-messaging program that reached two different Lines over nearly fourteen months. Defendants worked from consumer data that tied Plaintiff's numbers to his name and home.

### H. Injuries

49. The injury Defendants inflicted is the invasion of a right, and the harms that follow are the forms that invasion took. Plaintiff had decided, in the one way the law provides,

that sellers were not to reach him on either Line. He personally registered the 6154 Line on the National Do-Not-Call Registry on December 6, 2005, and the 8161 Line on February 6, 2007. He has added no line since. Registration was Plaintiff's declaration, and the law's mechanism, for being let alone.

50. Each of Defendants' eight contacts overrode that declaration. Each took Plaintiff's attention without asking for it, on a line he keeps for himself and his household. Each interrupted whatever Plaintiff was doing, and each required him to read or answer, to screen, to identify the caller or sender, and to determine whether the contact was lawful, all in service of a transaction he had said in advance he did not want. On Call A-1 it also required him to discover, over nearly six minutes, that he was being solicited by a machine that would not say so. The time consumed, the attention diverted, the solitude broken, and the household interrupted are not separate injuries; each is what it looked like when Plaintiff's right to decide who may reach him was taken from him.

51. The tangible components of that injury can be counted and are itemized in Count V below. The count is the smallest part of the injury, not its measure. Nor did Defendants' contacts arrive alone. From January 22, 2026, when Defendants first reached the 8161 Line, through June 24, 2026, when they last did, the 8161 Line also received at least twenty-three other unsolicited commercial telephone calls, from at least nineteen other numbers, and at least twenty-four other unsolicited commercial text messages, every one to a number Plaintiff had registered on the National Do-Not-Call Registry more than eighteen years earlier. Plaintiff does not seek to hold Defendants liable for calls or

messages that others placed or sent. Each of Defendants' contacts, however, landed on a line already absorbing that volume and added to it, and the intrusion of each is measured in that setting, not as though it were the only unwanted contact Plaintiff received.

52. Each contact also caused Plaintiff the concrete harms Congress identified in enacting the TCPA: invasion of privacy, intrusion upon seclusion, disruption of his personal use of the Lines, consumption of cellular airtime and message capacity, and the expenditure of time to investigate the identity of callers and senders who would not give it and to document the violations. Those harms are sufficiently concrete to establish Article III standing. *Van Patten*, 847 F.3d at 1043.

53. Plaintiff's registrations were his effort to avoid exactly these contacts, and the harms enumerated above are the record of that effort being defeated. The TCPA affords relief to those persons who, "despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer*, 925 F.3d at 650.

54. These harms are the very harms Congress and the Arizona Legislature acted to prevent. In enacting the TCPA, Congress found that unrestricted telemarketing had become "an intrusive invasion of privacy." Pub. L. No. 102-243, § 2, ¶ 5 (1991).

55. The Arizona Legislature likewise determined that an outbound telephone solicitation call or text message to a number on the National Do-Not-Call Registry is an unlawful practice, A.R.S. § 44-1282(B); that an unsolicited telephone sales call to a mobile telephone is an unlawful practice, A.R.S. § 44-1278(B)(3); and, through the Consumer Fraud Act, declared deceptive and unfair practices in connection with the sale

or advertisement of merchandise to be unlawful, A.R.S. § 44-1522, enforceable by private consumers who are damaged thereby, *Sellinger v. Freeway Mobile Home Sales, Inc.*, 110 Ariz. 573, 575–76, 521 P.2d 1119, 1121–22 (1974).

56. Defendants' conduct is the pattern both legislatures set out to end. They reached two numbers registered for more than eighteen and nineteen years, eight times over fourteen months, under trade names that led nowhere and in one instance under no name at all, through a machine that would not admit it was one, and with each contact directed at Plaintiff's home or his property. This is the predatory telemarketing that both the federal and Arizona legislatures sought to eradicate.

**I. Basis for Injunctive Relief**

57. Plaintiff has a reasonable apprehension of future violations, and there is a likelihood that Defendants' unlawful conduct will recur, drawn from Defendants' own operating posture: Defendants hold Plaintiff's telephone numbers, name, and home address in their calling and messaging data and have used them in three separate campaigns; they reach Plaintiff from cloud-telephony numbers that carry no seller's name; the block Twilio reported on September 25, 2026 (paragraph 24) is a carrier's action against one customer account on one carrier's network, which does not remove Plaintiff's information from Defendants' data, does not reach a call that did not traverse Twilio's network, as Twilio states of the call displaying the number shown on Call B-2, and does not prevent Defendants from reaching Plaintiff through another account or another carrier; their callers and senders will not state the seller's legal name, address, or telephone number, so

that Plaintiff cannot direct a do-not-call request to anyone; the text campaign returned to Plaintiff's Lines at intervals over fourteen months; and the calling system used on Call A-1 is an automated agent that will place the same call as often as it is directed to. A backward-looking, per-violation damages award compensates the past contacts but does not restrain Defendants' continuing use of the same data and the same absence of procedures that produced them, and a carrier's enforcement action against its customer is not an undertaking by any Defendant; only prospective injunctive relief addresses that continuing exposure. Plaintiff accordingly seeks an injunction requiring Defendants to suppress both Lines from all of Defendants' telemarketing and text-messaging campaigns, calling and messaging files, and lead sources, to direct their vendors and any platform through which they call or message to do the same, and to implement and maintain written do-not-call policies and list-scrubbing procedures compliant with 47 C.F.R. § 64.1200(d).

## COUNT I — VIOLATION OF 47 U.S.C. § 227(b)(1)(A)(iii): ARTIFICIAL VOICE CALL TO A CELLULAR TELEPHONE NUMBER (ALL DEFENDANTS)

58. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

59. 47 U.S.C. § 227(b)(1)(A)(iii) prohibits any person from making any call, other than a call made for emergency purposes or with the prior express consent of the called party,

using an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service.

60. Call A-1 was made to the 8161 Line, a number assigned to a cellular telephone service, using an artificial voice, without Plaintiff's prior express consent and not for emergency purposes, in violation of 47 U.S.C. § 227(b)(1)(A)(iii). Plaintiff is entitled to statutory damages under 47 U.S.C. § 227(b)(3).

61. The aforesaid violation was willful and/or knowing.

## COUNT II — VIOLATION OF 47 U.S.C. § 227(b)(1)(A)(iii): AUTOMATIC TELEPHONE DIALING SYSTEM (TEXT MESSAGES) (ALL DEFENDANTS), PLEADED IN THE ALTERNATIVE

62. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

63. 47 U.S.C. § 227(b)(1)(A)(iii) prohibits any person from making any call, other than a call made for emergency purposes or with the prior express consent of the called party, using any automatic telephone dialing system to any telephone number assigned to a cellular telephone service. A text message is a call. *Satterfield*, 569 F.3d at 952.

64. On information and belief, Texts C-1 through C-5 were sent using an automatic telephone dialing system, that is, equipment having the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers, as shown by the messages' common template, their absence of any personalization, their scheduled recurrence across two different Lines over fourteen

months, and the automated "reply stop" keyword opt-out on which they relied. Each was sent to a Line assigned to a cellular telephone service, without Plaintiff's prior express consent and not for emergency purposes, in violation of 47 U.S.C. § 227(b)(1)(A)(iii). Plaintiff is entitled to statutory damages under 47 U.S.C. § 227(b)(3).

65. The aforesaid violations were willful and/or knowing.

## COUNT III — VIOLATION OF 47 C.F.R. § 64.1200(c)(2): NATIONAL DO-NOT-CALL REGISTRY, ACTIONABLE UNDER 47 U.S.C. § 227(c)(5) (ALL DEFENDANTS)

66. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

67. Each of Calls B-1 and B-2 and Texts C-1 through C-5 violated 47 C.F.R. § 64.1200(c)(2), in that Defendants initiated telephone solicitations to a residential telephone subscriber who had registered his telephone numbers on the National Do-Not-Call Registry, without prior express invitation or permission and without an established business relationship. Plaintiff received more than one such telephone solicitation within a twelve-month period by or on behalf of the same entity: two within two days by or on behalf of the entity doing business as "Straight Layer," and five within fourteen months, each within twelve months of another, by or on behalf of the entity doing business as "the Auto Glass Guys."

68. The aforesaid violations were willful and/or knowing.

## COUNT IV — VIOLATION OF 47 C.F.R. § 64.1200(d)(4): FAILURE TO IDENTIFY THE SELLER, ACTIONABLE UNDER 47 U.S.C. § 227(c)(5) (ALL DEFENDANTS)

69. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

70. 47 C.F.R. § 64.1200(d)(4) requires a person or entity making a call for telemarketing purposes to provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.

71. Each of Calls B-1 and B-2 violated 47 C.F.R. § 64.1200(d)(4), in that the callers gave no telephone number or address at which the person or entity on whose behalf the call was made could be contacted, and gave, as the name of that person or entity, only the trade name "Straight Layer," which the caller on Call B-1 acknowledged would not appear in any search.

72. The aforesaid violations were willful and/or knowing.

## COUNT V — VIOLATION OF A.R.S. § 44-1282(A) (OUTBOUND SOLICITATION CALL OR TEXT MESSAGE TO A DO-NOT-CALL NUMBER), AN UNLAWFUL PRACTICE UNDER A.R.S. § 44-1522, ACTIONABLE UNDER A.R.S. § 44-1533(B) (ALL DEFENDANTS)

73. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

74. A.R.S. § 44-1282(A) provides that "[a] seller or solicitor or anyone acting on behalf of a seller or solicitor shall not initiate an outbound telephone solicitation call or text message to any telephone number if the telephone number is entered in the national do-not-call registry . . . ." A.R.S. § 44-1282(B) provides that "[a] violation of this section is an unlawful practice pursuant to section 44-1522." The Arizona Consumer Fraud Act affords a private right of action to a consumer damaged by a practice declared unlawful under § 44-1522, a right the Arizona Supreme Court inferred from A.R.S. § 44-1533(B). *Sellinger*, 110 Ariz. at 575–76. The Federal Trade Commission's Telemarketing Sales Rule likewise treats a call to a number on the Registry as "an abusive telemarketing act or practice." 16 C.F.R. § 310.4(b)(1)(iii)(B).

75. Each of Calls A-1, B-1, and B-2 was an outbound telephone solicitation call, and each of Texts C-3, C-4, and C-5 was an outbound telephone solicitation text message, initiated to a Line while that Line was entered in the National Do-Not-Call Registry, in violation of A.R.S. § 44-1282(A), and each was therefore an unlawful practice under A.R.S. § 44-1522. Defendants acquired property, consumer data associating Plaintiff's telephone numbers with his name and home, and used it as the means of each unlawful contact, intending that Plaintiff answer or read, remain engaged, confirm his identity and ownership of his home, and agree to an inspection, a scheduled call with a "representative," or a purchase.

76. Plaintiff suffered, and seeks, actual damages of no less than $250 per violation, $1,500 in total. The figure is supported by four external benchmarks: it is half the $500

that Congress authorized for an identical do-not-call violation, 47 U.S.C. § 227(c)(5)(B); one-quarter of the up-to-$1,000-per-violation civil penalty the Arizona Legislature authorized the Attorney General to seek for the identical conduct, A.R.S. § 44-1282(B); at the low end of the per-violation minimums that state legislatures have set for private do-not-call enforcement; and a small fraction of the up-to-$10,000-per-willful-violation penalty available to the Attorney General under the Consumer Fraud Act generally. Plaintiff's documented tangible costs, the time consumed by the calls and messages, the time spent documenting and preserving each recording and message, and the time spent investigating the callers' and senders' identity through carrier and CNAM lookups and correspondence with the carrier of record, are itemized in Plaintiff's records and will be proven at trial; the balance of the figure reflects the non-economic but real injury that Congress and the Arizona Legislature recognized as inherent in an unwanted solicitation, and that Arizona recognizes as the invasion of seclusion, *Godbehere*, 162 Ariz. 335.

77. Defendants' violations were willful and knowing.

78. Defendants' conduct was guided by an evil mind within the meaning of *Rawlings v. Apodaca*, 151 Ariz. 149, 161–62, 726 P.2d 565, 577–78 (1986). Defendants solicited two numbers registered for more than eighteen and nineteen years, on six occasions within the limitations period, from cloud-telephony numbers that carried no seller's name; deployed on Call A-1 a machine that would not admit it was one, would not name its company, and gave Plaintiff his own number as its callback; named on Calls B-1 and B-2 a company that, in its caller's words, would not appear in any search; and messaged Plaintiff as a

"check-in" customer he had never been. Defendants thereby consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, the other registered subscribers whose numbers sit in the same calling and messaging data, entitling Plaintiff to punitive damages. *See Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 342–43, 666 P.2d 83, 87–88 (Ct. App. 1983).

## COUNT VI — VIOLATIONS OF A.R.S. §§ 44-1276(A), 44-1278(B)(3), AND 44-1278(B)(4) (UNDISCLOSED, UNSOLICITED, AND ARTIFICIAL-VOICE TELEPHONE SALES CALLS), UNLAWFUL PRACTICES UNDER A.R.S. § 44-1522, ACTIONABLE UNDER A.R.S. § 44-1533(B) (ALL DEFENDANTS)

79. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

80. A.R.S. § 44-1278(B) declares it "an unlawful practice pursuant to section 44-1522 for any seller or solicitor or anyone acting on their behalf who conducts a telephone solicitation in this state" to "[i]ntentionally make or cause to be made any unsolicited telephone sales call to any mobile or telephone paging device," A.R.S. § 44-1278(B)(3), or to "[m]ake a telephone call to any residential telephone using an artificial or prerecorded voice to deliver a message unless the call is initiated for emergency purposes or the call is made with the prior express consent of the called party," A.R.S. § 44-1278(B)(4). A.R.S. § 44-1276(A) requires that, "[b]efore beginning the solicitation or sales presentation over the telephone," the seller or solicitor disclose the complete street

address of the location from which the call is made, the complete street address of the seller's principal location, "[t]he legal name of the seller on whose behalf the solicitor is making the solicitation," "[t]he solicitor's true legal name," and "[t]hat the purpose of the call is to sell merchandise." A.R.S. § 44-1278(C) provides that "[f]ailure to comply with this article is an unlawful practice pursuant to section 44-1522," actionable by a damaged consumer under § 44-1533(B). *Sellinger*, 110 Ariz. at 575–76.

81. Each of Calls A-1, B-1, and B-2 was an unsolicited telephone sales call intentionally made to a Line, a mobile telephone, in violation of A.R.S. § 44-1278(B)(3). Call A-1 was, in addition, a telephone call to a residential telephone, the 8161 Line, using an artificial voice to deliver a message, not initiated for emergency purposes and not made with Plaintiff's prior express consent, in violation of A.R.S. § 44-1278(B)(4). On each of those calls, Defendants began the solicitation without disclosing the address from which the call was made, the address of the seller's principal location, or the seller's legal name, in violation of A.R.S. § 44-1276(A). On Call A-1 the artificial voice gave two different first names and no seller's name at all, and presented the call as a follow-up on Plaintiff's supposed interest in "a cash offer"; on Calls B-1 and B-2 the callers gave only the trade name "Straight Layer" and presented the call as a neighborhood roof check. Each violation is an unlawful practice under A.R.S. § 44-1522, independent of the do-not-call violations alleged in Count V.

82. Plaintiff suffered actual damages in the amount set forth in paragraph 76, proximately caused by Defendants' unlawful conduct. Plaintiff does not seek duplicative

recovery of the same actual damages across Counts V and VI; the violations alleged in this Count independently establish liability and further aggravate the reprehensibility of Defendants' conduct for purposes of punitive damages.

83. Defendants' violations were willful and knowing, and Defendants' conduct was guided by an evil mind within the meaning of *Rawlings*, 151 Ariz. at 161–62: Defendants chose to sell by telephone in Arizona from numbers that carried no seller's name, through an automated voice and live callers that withheld the seller's legal name and address at the outset of every call and, when asked directly, refused to supply them. Defendants thereby consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others, entitling Plaintiff to punitive damages.

## COUNT VII — INTRUSION UPON SECLUSION (ALL DEFENDANTS)

84. Plaintiff incorporates paragraphs 1 through 57 as if fully set forth herein.

85. Arizona recognizes intrusion upon seclusion as an independent tort. *Godbehere*, 162 Ariz. 335; *Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 947 P.2d 846 (Ct. App. 1997); Restatement (Second) of Torts § 652B (1977). One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs is subject to liability for invasion of privacy if the intrusion would be highly offensive to a reasonable person.

86. Defendants intentionally intruded upon Plaintiff's solitude and seclusion. They placed, and intended to place, three commercial telephone calls and five commercial text messages onto cellular lines that Plaintiff maintains for personal and household use and

that Plaintiff had registered on the National Do-Not-Call Registry for more than eighteen and nineteen years for the express purpose of being let alone. The intrusion was neither incidental nor accidental. Defendants reached Plaintiff from data that tied his numbers to his name and his home.

87. The intrusion would be highly offensive to a reasonable person. What elevates it beyond an ordinary unwanted call is its character: a computer-generated voice that recited Plaintiff's home address to him, asked his asking price for a home he had never offered for sale, refused to say who it was or to admit it was a machine, and gave him his own telephone number as its own; a roofing caller that recited his home address, named a company that would not appear in any search, and asked the name of his insurer; and a text campaign that returned to his Lines for nearly fourteen months posing as a "check-in" from a business he had never used. It was also an addition to the intrusion pleaded in paragraph 51: each contact to the 8161 Line arrived on a registered line that, during the same months, was receiving at least twenty-three other unsolicited commercial calls and at least twenty-four other unsolicited commercial text messages from others, so that Defendants' contacts were not an isolated imposition but a contribution to a sustained one. A reasonable person in Plaintiff's position would find it highly offensive.

88. As a direct and proximate result of Defendants' intrusion, Plaintiff suffered injury to his interest in privacy and seclusion: his right to the solitude of his own home and to decide for himself who may command his attention on lines he keeps for personal use and registered to be free of solicitation. That interest was invaded the moment each

contact intruded, and the invasion is itself the injury the tort redresses. Plaintiff's injury includes annoyance, aggravation, mental distress, loss of peace and repose, and disruption of his personal use of the Lines. Intrusion upon seclusion is actionable upon proof of the intrusion and the resulting harm to the plaintiff's privacy interest, without proof of pecuniary loss. Restatement (Second) of Torts §§ 652B, 652H. Plaintiff pleads this Count independently and in the alternative: to the extent the Court determines that non-economic privacy damages are not recoverable under the Consumer Fraud Act, those damages remain recoverable under this common-law claim.

89. Defendants' intrusion was intentional and was guided by an evil mind within the meaning of *Rawlings*, 151 Ariz. at 161–62: Defendants consciously pursued a course of conduct, reaching two long-registered numbers eight times through numbers that carried no seller's name, under trade names that led nowhere, and through an automated voice configured to conceal both its nature and its principal, knowing that it created a substantial risk of significant harm to others. Plaintiff is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the aforesaid premises considered, Plaintiff prays that this Court enter judgment for Plaintiff and against each Defendant, for the contacts for which that Defendant is liable under paragraph 25, jointly and severally with every other Defendant liable for the same contacts, as follows:

(a) On Counts I and II, statutory damages under 47 U.S.C. § 227(b)(3), and on Counts III and IV, statutory damages under 47 U.S.C. § 227(c)(5), in each case trebled for willful and knowing violations, as follows:

| **Count** | **Provision** | **Violations** | **Base ($500 each)** | **Trebled** |
|---|---|---|---|---|
| I | 47 U.S.C. § 227(b)(1)(A)(iii) (artificial voice) | 1 | $500 | $1,500 |
| II | 47 U.S.C. § 227(b)(1)(A)(iii) (automatic telephone dialing system) | 5 | $2,500 | $7,500 |
| III | 47 C.F.R. § 64.1200(c)(2) | 7 | $3,500 | $10,500 |
| IV | 47 C.F.R. § 64.1200(d)(4) | 2 | $1,000 | $3,000 |
| TOTAL | | 15 | $7,500 | $22,500 |

The cumulative total amount of federal TCPA statutory damages claimed in this action is $22,500.00, trebled from a base of $7,500.00 because the violations were willful and/or knowing. Counts III and IV plead distinct regulatory violations. To the extent the Court determines that 47 U.S.C. § 227(c)(5) permits one award for each call rather than for each regulation violated during the call, *see Charvat v. GVN Michigan, Inc.*, 561 F.3d 623, 631–32 (6th Cir. 2009), Plaintiff requests the maximum recovery permitted for each call;

(b) On Counts V and VI, actual damages of not less than $250 per violation, $1,500 in total, under A.R.S. § 44-1533(B);

(c) On Count VII, damages for intrusion upon seclusion, including non-economic damages for the invasion of Plaintiff's privacy and seclusion, annoyance, aggravation, and mental distress, in an amount to be proven at trial;

(d) Punitive damages on Counts V, VI, and VII in an amount to be determined by the trier of fact, consistent with *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986), and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), sufficient to deter these Defendants from continuing the conduct alleged;

(e) A permanent injunction under 47 U.S.C. §§ 227(b)(3) and 227(c)(5) requiring Defendants to suppress both Lines from all of Defendants' telemarketing and text-messaging campaigns, calling and messaging files, and lead sources, to direct their vendors and any platform through which they call or message to do the same, and to implement and maintain written do-not-call policies and list-scrubbing procedures compliant with 47 C.F.R. § 64.1200(d);

(f) Plaintiff's taxable costs and disbursements;

(g) Interest at the applicable statutory rate;

(h) To the extent the Court determines that any portion of the foregoing damages would constitute duplicative recovery, damages up to the maximum non-duplicative amount permitted by law; and

(i) Such other and further relief as the Court deems just and proper.

Plaintiff demands a trial by jury on all issues so triable.

**Exhibits:** A — National Do-Not-Call Registry verification, (602) 246-6154; B — National Do-Not-Call Registry verification, (303) 378-8161.

Dated this 1st day of October, 2026.

Danny H. Cooprider, *In Propria Persona*

Gmail

Dan Cooprider <dhcooprider@gmail.com>

## National Do Not Call Registry - Your Registration Is Confirmed

1 message

**Verify@donotcall.gov** <Verify@donotcall.gov> Fri, Jul 25, 2025 at 4:53 PM
To: dhcooprider@gmail.com

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 6154 on December 06, 2005. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov to register another number or file a complaint against someone violating the Registry.

**************************************************************************************************************

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

EXHIBIT B

Gmail

Dan Cooprider <dhcooprider@gmail.com>

## National Do Not Call Registry - Your Registration Is Confirmed

1 message

**Verify@donotcall.gov** <Verify@donotcall.gov> Fri, Jul 25, 2025 at 4:53 PM
To: dhcooprider@gmail.com

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 8161 on February 06, 2007. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov to register another number or file a complaint against someone violating the Registry.

***********************************************************************************************************

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.